**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**COALITION TO PROTECT AMERICA'S NATIONAL PARKS,** an Arizona non-profit corporation, 2 Massachusetts Ave. NE, Unit 77436 Washington, DC 20013,
**ECOLOGICAL COLLECTIVE, USVI, INC.,** a U.S.V.I non-profit corporation, 420 Chocolate Hole, St. John, VI 00830

***Plaintiffs*,**

v.

**UNITED STATES DEPARTMENT OF THE INTERIOR**, 1849 C Street NW, Washington, DC 20240;

**UNITED STATES NATIONAL PARK SERVICE** 1849 C Street NW, Washington, DC 20240;

**EXECUTIVE OFFICE OF THE PRESIDENT** 1600 Pennsylvania Avenue NW Washington, DC 20500;

**DONALD J. TRUMP**, in his official capacity as President of the United States, 1600 Pennsylvania Avenue NW Washington, DC 20500;

**SUSIE WILES,** in her official capacity as Chief of Staff, 1600 Pennsylvania Avenue NW Washington, DC 20500;

**DOUGLAS BURGUM,** in his official capacity as Secretary of the Interior,1849 C Street NW, Washington, DC 20240;

**JESSICA BOWRON**, in her official capacity as acting director of the National Park Service 1849 C Street, NW, MS-6511 Washington, DC 20240

**Civil Action No.________**

**DARELL ECHOLS,** in his official capacity as
Acting Regional Director of Region 2 of the
National Park Service, 100 Alabama Street SW,
1924 Building, 6th Floor Atlanta, GA 30303;

**PENELOPE DEL BENE** in her official capacity
as Superintendent of the Virgin Islands
National Park, 1300 Cruz Bay Creek,
St. John, VI 00830.

*Defendants*. October 26, 2026

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND (IN THE ALTERNATIVE) FOR A WRIT OF PROHIBITION**

## Introduction

1. The Coalition to Protect America's National Parks and the Ecological Collective, USVI, Inc. bring a procedural rights challenge principally under the Administrative Procedure Act to stop the National Park Service from illegally leasing land at Caneel Bay in the U.S. Virgin Islands National Park to a resort developer.

2. The authorization for a lease at Caneel Bay was formally executed in 2023 in a final agency action document known as a Finding of No Significant Impact and is being implemented now.

3. The plaintiffs claim that the land lease authorization and its implementation are procedurally illegal, among other reasons, because:

- The Park Service authorized a land lease when the provision of accommodations on national park land is only permitted under a highly-restrictive concession contract.
- The Park Service lease authorization was for one limited-development plan, but, in the wake of a 2025 presidential executive order, the Park Service is

> implementing another plan that is entirely different—a public-excluding plan that the Park Service had just specifically rejected in a formal study.

4. The plaintiffs ask the Court for a temporary and permanent injunction to stop this illegal activity and require the Park Service to follow lawful procedures.

**Jurisdiction**

5. The Court has jurisdiction over this action under 28 U.S.C. § 1331 because it raises a federal question.

6. This is an action for administrative review permitted under the Administrative Procedure Act, 5 U.S.C. § 702, an alternative action for a writ of prohibition under the All Writs Act, 28 U.S.C. §§ 1651, and an action to enjoin ultra vires activity.

7. An actual, justiciable controversy exists between the plaintiffs and the defendants as defined under the Declaratory Judgment Act, 28 U.S.C. § 2201, and the Court has the power to grant relief under the Administrative Procedure Act, 5 U.S.C. §§ 701–6, the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, and the All Writs Act, 28 U.S.C. §§ 1651.

**Venue**

8. Venue is proper in this district under 28 U.S.C. § 1391, the Federal Venue Statute, because the defendants are agencies or officials of the United States residing in Washington, D.C.

**Parties**

9. The plaintiff Coalition for the Protection of America's National Parks (Parks Coalition) is a non-profit organization with over 5,000 members composed of former National Park Service employees and official volunteers with the mission of educating, speaking, and acting to protect

the National Park System consistent with the mission of the parks to conserve America's natural and historic treasures for the unimpaired enjoyment of this and future generations of Americans.

10. Members of the Parks Coalition include Brion FitzGerald, former superintendent of the U.S. Virgin Islands National Park (the Park), Henry Anderson, former deputy superintendent of the Park, and Ken Wild, former archeologist for the Park. Each of these individuals had regular and extensive involvement professionally and recreationally with the Park in general and Caneel Bay in particular when they worked for the Park Service, including regulating activity there as well as, in their free time, engaging in activities including touring historic sites, running, hiking, swimming, and snorkeling at Caneel Bay. They have continued to visit and enjoy these kinds of aesthetic, environmental, and recreational benefits of Caneel Bay on a regular basis since leaving the Park Service by visiting annually or semi-annually. Each of them has specific plans to visit Caneel Bay during 2027 for hiking, swimming, snorkeling or the viewing of historic or environmental sites. The enjoyment of the aesthetic, environmental, and recreational opportunities of each of them face grave, immediate, and irreparable harm from the activities described in this complaint, especially from the abandonment of guaranteed access to Caneel for their activities and the prospect that Caneel Bay will become overdeveloped and no longer suitable or possible to visit.

11. The plaintiff Ecological Collective, USVI, Inc. (Eco-Collective) is a non-profit organization of United States Virgin Islands residents, park users, and park supporters whose purpose is to protect the natural and historic environment of the U.S. Virgin Islands while supporting sustainable economic opportunities for local residents and businesses.

12. Members of the Eco-Collective include Eleanor Gibney a life-long resident of St. John and an adjoining neighbor to the Park. Ms. Gibney is a horticulturalist who currently works

on Park projects. She propagated many of the trees currently on Caneel Bay and tended and shaped the landscape there. Her home is one-half mile from Caneel Bay on the same road. She faces grave, imminent, and irreparable harm because if Caneel Bay is overdeveloped, she will not only lose the aesthetic and environmental enjoyment of seeing the fruits of her life's work, the enjoyment of her own land will be sorely diminished by traffic, noise, and strain on the island's scarce water, waste removal, and electricity resources.

13. Eco-Collective members include Linda Suchochleb, the "St. John Turtle Lady" who presently snorkels at Caneel Bay Beach four to five times a week and produces stunning underwater video work which she posts on an Instagram account that has had as many as 140,000 views. The prospective loss of guaranteed beach public beach access as alleged in this complaint together with looming overdevelopment threatens her with grave, immediate, and irreparable harm in the form of limiting or eliminating her access to the best turtle spot on the island and making any access she is allowed unrewarding because of the prospective overcrowding at the beach and in the adjoining waters.

14. Eco-Collective members include Ronnie Lee an 89-old St. John homeowner whose regular activity on the island centers around twice weekly visits to Caneel Bay beach with his wife. Lee and his wife use this beach because it is the only one on the island with parking proximity, level ground, level entry into the water, and lack of heavy surf sufficient to allow them to enjoy the water. The elimination of guaranteed public access to this beach as alleged here threatens Lee with the grave, immediate, and irreparable harm that would come from eliminating the central feature of his and his wife's enjoyment of the island: their ability to access a public beach for their recreation and health.

15. Because members of both the Parks Coalition and the Eco-Collective would have standing to sue on their own, the two organizations each have associational standing to bring this lawsuit.

16. The defendant United States Department of the Interior is an agency of the United States.

17. The defendant National Park Service is a bureau within the Department of the Interior.

18. The defendant Douglas Burgum is the Secretary of the Department of the Interior. He is sued in his official capacity.

19. The defendant Jessica Bowron is the Acting Director of the National Park Service. She is sued in her official capacity.

20. The defendant Darrell Echols is the Acting Regional Director of Region 2 of the National Park Service which embraces Virgin Islands National Park. He is sued in his official capacity.

21. The defendant Penelope Del Bene is the Superintendent of the Virgin Islands National Park. She is sued in her official capacity.

22. The defendant Donald J. Trump is President of the United States. He is sued in his official capacity.

23. The defendant Susie Wiles is the president's Chief of Staff and head of the Executive Office of the President. She is sued in her official capacity.

24. The defendant Executive Office of the President is the centralized group of agencies, councils, and immediate staff created by Congress in 1939 to support the President of the United States in managing the executive branch.

25. The defendants named in paragraphs 16 to 21will be referred to in this complaint as the "agency defendants." The defendants in paragraphs 22 to 24 will be referred to in this complaint as the "non-agency defendants."

## Factual Background

### Caneel Bay

26. Virgin Islands National Park was established in 1956 following a donation of land by Laurance Rockefeller.

27. It includes some 5,000 acres of land on the island of St. John.

28. The Park Service has explained the importance of this pristine property online:

> The park's natural resources consist of coral reefs, seagrass beds, mangroves, and other marine habitats that support sea turtles, corals, and other marine life. Virgin Islands National Park also protects some of the last remaining native tropical dry rain forest in the Caribbean. In 1976, the park was designated as an International Biosphere Reserve by the United Nations Educational, Scientific and Cultural Organization (UNESCO). The park was one of the first protected areas in the world to receive this designation. Of the hundreds of UNESCO biosphere reserves worldwide, the park is 1 of only 30 reserves containing both marine and terrestrial ecosystems. It provides vital habitat for approximately 130 bird species, 400 reef-associated fish species, 17 species of whales and dolphins, 13 reptile species, numerous sponges, and more than 45 stony coral species. A number of marine and terrestrial species within the boundaries of the park and monument are federally listed as endangered or threatened.
>
> The park's cultural resources are abundant and diverse, including prehistoric archeological sites, hundreds of historic structures, offshore shipwrecks, and museum collections that encompass artifacts dating as far back as 840 BC. The Virgin Islands have been inhabited for at least 3,000 years, beginning with hunter-gatherers of the Archaic Period. Settlement continued throughout prehistory and ended with the development of the Taino culture, the pre-Columbian people who were present when Columbus explored the New World. When Europeans arrived, the Virgin Islands became a melting pot, inhabited by people from around the world who came to make a new life on the islands. These

> colonial settlements date from the 17th century through the 19th century. Visitors can explore the ruins of hundreds of historic structures to get a sense of this rich history.

29. Caneel Bay is a 150-acre peninsula of land within the park.

30. According to the Park Service:

> In the mid-1950s, Laurance Rockefeller established Caneel Bay Resort (resort) as an early model of ecotourist luxury accommodations to highlight the natural beauty of St. John. Within the boundaries of the resort are culturally significant ruins and archeological sites that span the archaic period through European colonialism and postcolonial emancipation. The resort was operated continuously from the 1950s through 2017, when it closed due to damage from Hurricanes Irma and Maria. Prior to the hurricanes, the property was operating as a luxury resort with approximately 100 buildings and structures used for lodging (166 rooms), food services, recreation, maintenance, security, and utilities. The resort facilities are bordered by pristine beaches and undeveloped land. Prior to the 2017 hurricanes, elements of the property had been determined by NPS to be eligible for listing in the National Register of Historic Places as an historic district. In 1983, Jackson Hole Preserve, Inc. donated the 150-acre property to NPS for inclusion within the Park, subject to a RUE [Retained Use Estate]. The RUE allow[ed] its operator, currently CBI Acquisitions, LLC (CBIA), to use the property as a resort until September 30, 2023.

31. The Park Service itself has publicly recognized the fragility of the park and the danger of over-development in an online posting as follows:

> Virgin Islands National Park has been listed by the National Parks Conservation Association as one of the ten most endangered parks. The factors which lead to the park making the list include high potential for land development in the park, dangers posed to the marine resources by poorly controlled fishing, and years of insufficient funding. There are 256 historic structures, mostly from the Danish plantation era, that are not being stabilized because of the lack of funding.

32. The Park Service has further declared in such postings that: "A number of marine and terrestrial species within the boundaries of the park and monument are federally listed as endangered or threatened."

33. Following the 2017 hurricanes at Caneel Bay, the resort on that property ceased to



exist and its damaged buildings have been exposed to the elements now for over nine years. A Park Service Structural Assessment found only a minority of the buildings structurally sound. Park Service photographs show that little was left of some of the key buildings:

**Caneel Bay Redevelopment Planning**

34. During the years after the 2017 hurricanes, the Park Service weighed its options about what to do with the 150-acres at Caneel Bay. It came under the sole control of the Park Service when the Retained Use Estate expired on September 30, 2023, and, as the Park Service

announced in a 2021 newsletter, it was time for the Park Service to select a redevelopment strategy. Should the Park Service leave the property undeveloped? Restore the limited eco-resort? Place the entire land in the hands of a resort developer?

35. In 2021, the Park Service started the process of studying two of these potential redevelopment strategies in detail: 1. **Alternative A**: offer none of the land for resort accommodation development; and 2. **Alternative B**: offer 67 of the 150 acres to a resort developer for accommodations while mitigating any impact on the natural environment.

36. The study took the form of an Environmental Assessment under the National Environmental Policy Act, 42 U.S.C. § 4332 (NEPA).

37. In a section entitled "Alternative Elements Considered but Dismissed from Detailed Analysis," the Assessment explained that the Park Service rejected the third possible redevelopment strategy of authorizing an offer of the entire 150 acres at Caneel to a private developer on the grounds that it:

> would not integrate the value and history of the community of St. John or provide a range of visitor experiences, such as expanded day-use opportunities, and did not fulfill the NPS objectives to provide a strong NPS presence on site to give visitors a sense they are at a national park, and to ensure that the significant resources within the Caneel Bay area are managed in such a manner that is consistent with the NPS mission.

38. The Assessment quickly concluded that the no-development Alternative A strategy would have only a small-scale negative impact on Caneel Bay.

39. Ultimately, the Park Service chose for its redevelopment strategy— its "Preferred Alternative"—Alternative B which on a map looked like this:

**Map on Following Page**




40. The zones laid out for Alternative B (with emphasis added) were described in an accompanying table:

**Table 2. Management Zone Descriptions**

| z | Description (Desired Condition) | Facilities/Activities |
|---|---|---|

| | | |
|---|---|---|
| **Lodging Zone (67 acres)** | Visitors would be provided an overnight experience commensurate with Laurance Rockefeller's vision and site history for Caneel Bay. The overnight experience would be that of a twenty-first century eco-resort. In this zone, the overnight lodging and amenities would be that of an eco-destination and model for sustainable management practices that participate in a circular island economy (explained further in the "Future Commercial Opportunities" section of this EA). This zone would be managed through a lease(s) and/or concession contract(s). This zone would include visitor amenities, such as dining and gift shops to support the overnight guests. The operator(s) would be responsible for sustainable operations.<br>Areas with evidence of past disturbance, such as the tennis court area, would be a focus of new development because these areas suspected of having low natural and archeological resource potential. | • Overnight lodging and amenities would be provided such as lodging, dining, gift shops, beach access, employee housing, and associated infrastructure.<br>• The redevelopment would attempt to reuse existing structures and infrastructure where possible. However, the integrity of the structures is unknown, and the NPS cannot predict what can be reused or repurposed at this time.<br>• Ongoing maintenance activities would occur, such as landscaping, mowing, and general upkeep of the ground, and include trash removal and cleaning of facilities.<br>• Public access of day-use areas and facilities via roads and trails in this zone would be a condition of any lease(s) or concession contract(s) and coordinated with the larger Caneel Bay area redevelopment.<br>• Utility corridors and pipelines would exist to support facilities. |
| **Day-use Zone (5 acres)** | Visitors, including residents of St. John, would be provided access to several beaches within the Caneel Bay area for recreation/day-use. In this zone, visitors would be provided amenities to enhance the visitor experience. Management by the NPS would be consistent with other public beaches at the Park, and concessions contracts would be used to provide visitor services. | • Public bathrooms/shower facilities.<br>• Picnic areas/tables.<br>• Food services by concessioner.<br>• Equipment rentals (i.e., watersport rentals).<br>• Swimming, snorkeling, and other water activities. |

| | | |
|---|---|---|
| **Conservation Zone (78 acres)** | All Park visitors would be able to connect with the natural areas of the Park through pedestrian access on some existing roads and trails throughout the Caneel Bay area. This zone would be managed by the NPS. The desired condition in this zone is a natural and undeveloped landscape. The undeveloped nature of this zone would aid in the protection of areas with high archeological resource potential. | • Reestablish the Turtle Point and Hawksnest Trails.<br>• Some limited expansion of pedestrian trails to support connectivity throughout the site.<br>• No new development for overnight lodging or amenities. |

| Zone (Acreage) | Description (Desired Condition) | Facilities/Activities |
|---|---|---|
| **Interpretive/ Engagement Zone (11 acres)** | All visitors would have an opportunity to have a national park experience by engaging with the NPS onsite, including through an NPS visitor contact station. Visitors would be encouraged to learn about the site's history through interpretation of cultural sites, including the archaic, colonial, and post-emancipation era sites. Resources in this area would be managed and maintained by the NPS. All of the archeological sites previously determined eligible for the NRHP, including the plantation sugar factory complex, are located within this zone and would be subject to active NPS preservation. | • NPS entrance/contact station.<br>• Restoration or rehabilitation and upkeep of historic structures and sites by the NPS.<br>• Interpretive program to tell the story of the Caneel Bay area, including interpretive sites and signage. |
| **Operations/ Maintenance Zone (7 acres)** | This zone would support all operations and maintenance activities within the Caneel Bay area. Some space could be dedicated for NPS use to aid in operational efficiencies. This area would be visibly shielded from visitors, and access would be restricted to authorized personnel only. This zone contains historic buildings and landscape features that would be | • Maintenance buildings.<br>• Staff parking lots.<br>• Administrative offices.<br>• Infrastructure facilities (e.g., septic systems, utility distribution facilities, etc.).<br>• Maintenance equipment and vehicle storage for overnight lodging operations.<br>• Water treatment facility.<br>• Utility corridors and pipelines. |

| | | |
|---|---|---|
| | preserved and adaptively reused, as practicable. | |
| **Flexible Development Zone (7 acres)** | This zone includes lands that were previously disturbed (i.e., landfill, water catchment area) and would be available for future developers/operators to utilize as part of their operations. | • Use to be determined in consultation with future developers/operators but could include storage and parking, among other uses. |

41. In the Environmental Assessment, the Park Service said it chose the Alternative B redevelopment strategy because it: "aims to balance enhanced public access, recreational opportunities, resource protection, and Park operational efficiency while reestablishing an overnight experience on a portion of the original RUE that is consistent with the landscape as envisioned by Laurance Rockefeller."

42. These limitations were the foundation of a Park Service final action authorizing Park Service employees to implement its redevelopment strategy. The final action was memorialized in a Determination of No Significant Impact, Attachment B to its Finding of No Significant Impact (FONSI) executed by Park Service officials in July 2023 after completion of the Environmental Assessment.

43. By approving the Alternative B redevelopment strategy, the Finding of No Significant Impact authorized implementation of the strategy through either a "lease(s) and/or concession contract(s)."

44. The Caneel Finding was a "mitigated" Finding. It authorized a development offer while finding, as the Assessment did, that there would be no significant impact on the park only because the Park Service bound itself to implementing specific environmental "conditions and mitigation" as contained in the Environmental Assessment to reduce the project's impact. The "conditions and mitigation" included: 1. limiting lodging to just 67 of the 150 acres to guarantee conservation and public overland beach and park access; 2. limiting the lodgings to 166 rooms; 3. keeping the key historic sites in Park Service hands; and 4. establishing doing business locally as a priority.

45. With the authorization in hand, the Park Service began implementing its preferred Alternative B redevelopment strategy on October 22, 2024 when it issued a Request for

Qualifications to develop a "short list" of four or five most qualified respondents to be followed by a Request for Proposals (RFP) to the members of the short list to develop proposals for the 67-acre Alternative B accommodations parcel.

46. The Request for Qualifications relied solely on the authorization to lease. It sought qualified companies to redevelop Caneel Bay, "through a lease with the National Park Service."

**An Abrupt Change of Strategies at Caneel**

47. On July 3, 2025, in Executive Order No. 14,313, President Donald Trump ordered the director of the National Park Service along with other agency heads to conserve public lands *while using them as vehicles for "driving economic growth."*

48. On May 7, 2026, in the wake of President Trump's order, the Park Service canceled the Request for Qualifications that was implementing the Finding and Alternative B redevelopment strategy. In its place, in direct contravention of its own Environmental Assessment and Finding of No Significant Impact, the Park Service started implementing a completely different strategy, offering to a developer Caneel's entire 150 acres to build resort accommodations—the very strategy it had just rejected as bad for the park.

49. On June 29, 2026, in an email to a reporter, the Department of the Interior Office of Communications publicly confirmed (with emphasis added here) that orders from above were responsible for the new Park Service strategy:

> Since July 2025, the National Park Service has worked with leaders from gateway communities in the U.S. Virgin Islands and **reviewed the project to ensure consistency with Executive Orders, Secretary's Orders and Department priorities focused on enhancing visitor experiences and *expanding competitive investment opportunities***.

50. On May 7, 2026, without publishing any precursor public notice, study, or documents of any kind, the Park Service issued a Request for Proposals to developers to lease the entire 150 acres at Caneel for the construction of a resort and lodging accommodations.

51. According to the Request for Proposals, the Environmental Assessment and Finding documents remain part of the GMP—the General Management Plan for the park, yet in violation of its terms, the Request guaranteed no public overland beach and park access, set no limit on room numbers, moved the key historic sites into the developer's hands, and dropped any mention of the previous priority of doing business locally.

52. Like the Request for Qualifications, the Request for Proposals relied solely on the authorization to lease, referring to the opportunity solely as a "leasing opportunity."

53. The bidding is now closed, and the Park Service has stated that it intends to make a decision in Fall/Winter 2026 and 2027.

54. The new area to be leased looks like this:



55. The Parks Coalition and the Eco-Collective challenge the following final Park Service actions:

- The authorization by the July 2023 Finding of No Significant Impact of the use of a land lease as the procedural means to develop and operate resort accommodations at Caneel Bay.

- The decision to issue the May 7, 2026 Request for Proposals without including the "conditions and mitigation" requirements of the Assessment and Finding.

- The cancellation of the Alternative B redevelopment strategy along with the Request for Qualifications implementing it that contained the "conditions and mitigation" requirements in the Environmental Assessment and Finding.

- The adoption of the considered but rejected alternative 150-acre redevelopment strategy with its implementing Request for Proposals.

- The decision, in violation of its own Assessment and Finding, to exclude from its new 150-acre development strategy the "conditions and mitigation" requirements mandated by these documents as follows:

    - limitation of the number of resort rooms to 166;
    - a public right to overland beach and park access;
    - the preservation of historic property outside the commercial zone;
    - the priority of employing and doing business with locals.

56. The actions listed in paragraph 55 were final agency actions subject to judicial review under the Administrative Procedure Act because:

- The Park Service is no longer studying whether to use a land lease to carry out its redevelopment strategy. It has formally authorized it through its Environmental Assessment and the executed Finding of No Significant Impact documents which were the culmination and consummation of the study work. It is presently reviewing lease proposals from developers.

- The Park Service is no longer studying whether to lease no acreage at the park, 67 acres at the park, or 150-acres at the park for accommodation development. It has decided to lease 150 acres at the park and, in violation of its own Finding, is implementing that decision through the Request for Proposals it issued on May 7, 2026.

- The Park Service is no longer studying whether to limit any accommodations to 166 rooms or fewer, whether to guarantee overland beach and park access, whether to keep the key historic sites in its hands or make local business opportunities a priority. It has decided to brazenly violate the conditions mandated by its own Environmental Assessment and Finding of No Significant Impact. It is implementing that decision through a Request for Proposals it issued on May 7, 2026.

- The actions challenged here have had real effects on the ground: they caused Park Service employees to cease working on the RFQ and redirect their efforts to a rushed, intricate, and expensive process for the Park Service and its bidders, mandating actions by Park Service personnel and bidders and setting a tight timetable of tasks that began immediately after the decisions were made. These decisions have also created bureaucratic momentum away from conservation and toward development and forced supporters of the park and local residents to scramble into a defensive posture.

- The actions listed in paragraph 55 have legal significance, because:

    - The Park Service decision in its Finding of No Significant Impact to authorize a lease exceeds its statutory authority under National Park leasing laws.
    - The Park Service is proceeding in direct violation of the "conditions and mitigation" requirements of its own Environmental Assessment and Finding of No Significant Impact.
    - By issuing its Request for Proposals, the Park Service reduced its legal right not to lease any land and its legal right to lease less than 150 acres to a right to cancel the entire leasing process which is itself subject to limitations and can be challenged if the cancellation isn't done for a compelling reason.[1]
    - The Park Service decreased the legal obligations of potential lessees to entrust historic conservation to the Park Service, to limit room numbers to 166, to guarantee public overland beach and park access, and to promote resident business opportunities by reducing these formerly mandatory measures to mere matters for negotiation.

---

[1] 36 C.F.R. § 18.8 (g) (The final terms of the lease must be consistent with the requirements of the RFP). See, e.g., *Seventh Dimension, LLC v. United States*, 160 Fed. Cl. 1, 19 (Fed. Cl. 2022).

## The Administrative Procedure Act

57. The Administrative Procedure Act, 5 U.S.C. §§ 701-706, provides federal judicial review of final agency actions. Among other things, it requires a reviewing court to "hold unlawful and set aside agency action, findings, and conclusions found to be—

- arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
- in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
- without observance of procedure required by law."

*Id.* § 706(2).

58. All the agency defendants are agencies or agency officials under the Administrative Procedure Act as set forth in 5 U.S.C. §§ 551(1), 701(b)(1).

**COUNT ONE: Administrative Procedure Act (Contrary to Law: Illegal Lease).**

59. The plaintiffs hereby incorporate into this count paragraphs 1-58 of this complaint.

60. Under the National Parks Omnibus Management Act, 54 U.S.C. § 102102(a), and the National Historic Preservation Act, 54 U.S.C. § 306121(a)(2), the National Park Service, may not offer to lease national park land to a private developer for the provision of visitor accommodations. To more closely monitor potential impacts on parks, the law requires the Park Service to authorize the provision of any visitor accommodation under more restrictive concession contracts.

61. Under 54 U.S.C. § 101914 concession contracts are more restrictive than leases because, among other things, concession contracts have shorter terms, face rate and price

controls, and operate under strict operating and performance standards overseen by the Park Service.[2]

62. To ensure the provision of accommodations is handled under concession agreements only, the Park Service leasing statute states: "The Secretary may not use a lease under subsection (a) to authorize the lessee to engage in activities that are subject to authorization by the Secretary through a concession contract, commercial use authorization, or similar instrument." 54 U.S.C. § 102102 (b).

63. The leasing regulations, 36 CFR §§ 18.4, 18.6, reinforce this: "Before leasing property in a park area under this part, the Director must determine that…(f) The proposed activities under the lease are not subject to authorization through a concession contract…."

63. Visitor accommodations cannot be authorized through a lease because they are subject to authorization through a concession contract. With emphasis added, the National Parks Omnibus Management Act states that: "the Secretary ***shall*** **utilize concession contracts to authorize a person, corporation, or other entity to provide accommodations**, facilities, and services to visitors to System units." 54 U.S. C. § 101913.

64. The regulations under the Act reinforce this explicit command, emphasizing that: "The purpose of concession contracts is to authorize persons (concessioners) to provide visitor services in park areas" (36 C.F.R. § 51.1) and that, among other things: "*Visitor services* means accommodations." 36 CFR § 51.3.

[2] The maximum concession term is 20 years, whereas the Park Service lease offered in the Request for Proposals is 60 years; 36 CFR § 51.82 (rates must be approved as "reasonable and appropriate."); 36 CFR § 51.82 (performance standards).

65. Furthermore, the May 7, 2026 Request for Proposals assumes major new accommodation buildings will be constructed on Caneel under a lease agreement. But the implementing regulations controlling national park land leases prohibit all but the most minor pieces of new construction under any land lease even if one were otherwise permitted here—which it is not. It states, with emphasis added, that:

> All leases entered into under this part must contain:
>
> …
>
> **(i)** Appropriate provisions stating that **the lessee may not construct new buildings or structures on leased property**, provided that, a lease may contain appropriate provisions that authorize the lessee to construct, subject to the prior written approval of the Director, **minor** additions, buildings and/or structures determined by the Director to be **necessary for support of the authorized activities** of the lessee and otherwise to be consistent with the protection and purposes of the park area. Approval by the Director of new construction may only be granted if the Director makes the determinations required by § 18.4.

36 C.F.R. § 18.12(i).

66. Because the Park Service's action authorizing a land lease for accommodations at Caneel Bay directly violates National Park Service laws mandating the use of more restrictive concession contracts rather than leases, the lease authorization and the agency actions, findings, and conclusions associated with it were invalid, unlawful, in excess of statutory authority, and taken without observance of procedure required by law. The Court, under the Administrative Procedure Act, must hold unlawful and set aside the July 2023 leasing authorization and enjoin its implementation.

**COUNT TWO: Administrative Procedure Act (Arbitrary and Capricious Implementation of Lease Authorization).**

67. The plaintiffs hereby incorporate into this count paragraphs 1-58 of this complaint.

68. The Park Service Finding of No Significant Impact was premised on the following "conditions and mitigation" requirements: 1. Limiting the accommodation leasing area to 67 acres to guarantee conservation and public overland beach and park access; 2. Limiting the number of guest rooms to no more than 166; 3. Retaining the key historic sites under Park Service control; 4. Making local business opportunities a priority of the redevelopment.

69. Having studied and formally adopted a strategy that depended on these mitigating measures, it was arbitrary, capricious, and an abuse of discretion for the Park Service to decide to implement and begin implementing another completely different plan that it had just rejected as bad for the park, especially without first giving public notice, adequate study, and a reasoned scientific explanation for the change. As a consequence, under the Administrative Procedure Act, the Court must hold unlawful, vacate, and enjoin implementation of the final agency actions listed in paragraph 55.

**COUNT THREE: Violation of the Administrative Procedure Act (Contrary to Law: National Parks Omnibus Management Act).**

70. The plaintiffs hereby incorporate into this count paragraphs 1 to 58 of this complaint.

71. The actions listed in paragraph 55 violated the National Parks Omnibus Management Act which requires the Secretary of the Interior to "ensure the full and proper utilization of the results of scientific study for System unit management decisions" and requires that the "administrative record shall reflect the manner in which System unit resource studies have been considered." 54 U.S. C. § 100706.

72. The agency defendants violated this act by not utilizing the "conditions and mitigation" requirements scientifically derived in its Environmental Assessment and mandated by its Finding of No Significant Impact.

73. On information and belief, the agency defendants further violated this act by making the final agency actions in paragraph 55 based upon an unexamined desire to create or enhance investment opportunities at Caneel Bay rather than the documented scientific study and analysis required for park management decisions.

74. For these reasons the agency defendants took the actions in paragraph 55 unlawfully, in excess of statutory authority, and without observance of procedure required by law.

75. Under the Administrative Procedure Act, as a consequence, the Court must hold unlawful, vacate, and enjoin implementation of the final agency actions listed in paragraph 55.

**COUNT FOUR: Violation of the Administrative Procedure Act (Contrary to Law: National Environmental Policy Act).**

76. The plaintiffs hereby incorporate in this count the allegations in paragraphs 1 to 58.

77. The lease of national park land carried out by a federal agency is "subject to substantial Federal control and responsibility" and is therefore a "major Federal action" under 42 U.S.C. § 4336e(10)(A) of the National Environmental Policy Act (NEPA).

78. Because it involves a major Federal Action, as defined under 42 USC § 4336e(10)(A) of the National Environmental Policy Act, the Park Service was obliged under 42 U.S.C. § 4332, before authorizing a lease of land at Caneel Bay, to prepare either a full Environmental Impact Statement or the Environmental Assessment and Finding of No Significant Impact that was finalized in July 2023.

79. While the Park Service could avoid doing a full Environmental Impact Statement by using an Environmental Assessment and a Finding of No significant impact, it could do so *only* if the project's environmental effects would remain below the threshold of significance.[3]

80. This means that under the National Environmental Policy Act, the Park Service can't adopt "conditions and mitigation" requirements for Caneel and then ignore them. The measures must be followed or an Environmental Impact Statement or, at a minimum a new Environmental Assessment and Finding, must be prepared before the Park Service takes actions like authorizing a lease or adopting and implementing a new redevelopment strategy.

81. By doing neither of these things, the Park Service violated the National Environmental Policy Act, and the agency defendants thus took the actions in paragraph 55 unlawfully, in excess of statutory authority, and without observance of procedure required by law.

82. Under the Administrative Procedure Act, as a consequence, the Court must hold unlawful, vacate, and enjoin implementation of the final agency actions listed in paragraph 55.

**COUNT FIVE: Violation of the Administrative Procedure Act (Contrary to Law: National Historic Preservation Act).**

83. The plaintiffs hereby incorporate in this count the allegations in paragraphs 1 to 58.

84. In Section 106 of the National Historic Preservation Act Congress mandated:

> the head of any Federal department or independent agency having authority to license any undertaking, prior to the approval of the expenditure of any Federal funds on the undertaking or prior to the issuance of any license, shall take into account the effect of the undertaking on any historic property.

54 U.S.C. §306108.

---

[3] *Grand Canyon Trust v.* FAA, 290 F.3d 339, 340 (D.C. Cir. 2002).

85. Regulations promulgated under the Historic Preservation Act require that the review be "initiated early in the undertaking's planning, so that a broad range of alternatives may be considered during the planning process for the undertaking." The regulations prohibit taking any actions that might "restrict the subsequent consideration of alternatives to avoid, minimize or mitigate the undertaking's adverse effects on historic properties." 36 CFR § 800.1(c).

86. The actions listed in paragraph 55 violated the National Historic Preservation Act, 54 U.S.C. §306108, in that, in making those decisions, particularly the decision to place the Caneel historic sites in the hands of a private developer, the Park Service failed to prepare the mandatory Section 106 evaluation at an early stage in the process while it had all its alternatives before it—including not leasing the historic sites to a developer.

87. For this reason, the agency defendants took the actions in paragraph 55 unlawfully, in excess of statutory authority, and without observance of procedure required by law

88. Under the Administrative Procedure Act, as a consequence, the Court must hold unlawful, vacate, and enjoin implementation of the final agency actions listed in paragraph 55.

**COUNT SIX: Violation of the Administrative Procedure Act (Contrary to Law: Lease Incompatible with Park Service Programs).**

89. The plaintiffs hereby incorporate in this count the allegations in paragraphs 1 to 58.

90. By virtue of Part 18 of Title 36 of the Code of Federal Regulations, under the National Parks Management Act and the National Historic Preservation Act, the Park Service may only lease park property when: "The lease is compatible with the programs of the National Park

Service." 36 C.F.R. § 18.4 (d). As Webster's Dictionary explains, a "program" is "a plan or system under which action may be taken toward a goal."[4]

91. Under the National Park Service Omnibus Management Act, every national park must create and update as necessary a program in the form of a General Management Plan. 54 U.S.C. § 100502.

92. The Park Service has a General Management Plan for Caneel Bay that was originally published in 1983. The "conditions and mitigation" requirements of the Environmental Assessment and Finding are now part of that plan. According to the Park Service in its Request for Proposals (with emphasis added): "the NPS completed NEPA compliance in 2023 related to redevelopment of the Resort that resulted in an EA and a FONSI, ***and incorporated it into the GMP***."

93. Having incorporated the "conditions and mitigation" requirements of the 2023 Environmental Assessment and Finding into the General Management Plan covering Caneel Bay, the Park Service may not authorize a lease incompatible with them. Its decision to do so in the form of the leasing and program actions described in paragraph 55, was arbitrary and capricious and violates the National Park Service Omnibus Management Act, meaning that the agency defendants took the leasing and program actions listed in paragraph 55 unlawfully, in excess of statutory authority, and without observance of procedure required by law.

94. For this reason, the agency defendants made the actions in paragraph 55 unlawfully, in excess of statutory authority, and without observance of procedure required by law

[4] "Program," Merriam-Webster, merriam-webster.com (last visited Sept. 24, 2026).

95. Under the Administrative Procedure Act, as a consequence, the Court must hold unlawful, vacate, and enjoin implementation of the final agency actions listed in paragraph 55.

**COUNT SEVEN: Violation of the Administrative Procedure Act (Contrary to Law: Virgin Islands National Park Organic Statute).**

96. The plaintiffs hereby incorporate in this count the allegations in paragraphs 1 to 58.

97. The actions listed in paragraph 55 violated the statute that created the basic mandates of the National Parks in that, in making the actions listed in paragraph 55, the agency defendants violated the congressional mandate in the statute that created the Virgin Islands which required that, "the national park shall be administered and preserved by the Secretary of the Interior ***in its natural condition for the public benefit and inspiration***, in accordance with the laws governing the administration of the national parks." 16 U.S.C. § 398.

98. For this reason, the agency defendants made the actions in paragraph 55 unlawfully, in excess of statutory authority, and without observance of procedure required by law.

99. Under the Administrative Procedure Act, as a consequence, the Court must hold unlawful, vacate, and enjoin implementation of the final agency actions listed in paragraph 55.

**COUNT EIGHT: Violation of the Administrative Procedure Act (Contrary to Law: National Historic Preservation Act and the Park Service general leasing authority).**

100. The plaintiffs hereby incorporate in this count the allegations in paragraphs 1 to 58.

101. The actions listed in paragraph 55 violated the National Historic Preservation Act, 54 U.S.C. § 306121, and the Park Service general leasing authority regulations in

that the actions listed in paragraph 55 would:

- "degrade the purposes and values of the park area;"
- "deprive the park area of property necessary for appropriate park protection, interpretation, visitor enjoyment;"
- be "incompatible with the programs of the National Park Service;"
- "[in]adequately insure the preservation of the historic property."

36 C.F.R. part 18.

102. For these reasons, the agency defendants made the actions listed in paragraph 55 unlawfully, in excess of statutory authority, and without observance of procedure required by law.

103. Under the Administrative Procedure Act, as a consequence, the Court must hold unlawful, vacate, and enjoin implementation of the final agency actions listed in paragraph 55.

**COUNT NINE: Violation of the Administrative Procedure Act (Contrary to Law: National Parks Organic Statute).**

104. The plaintiffs hereby incorporate in this count the allegations in paragraphs 1 to 58.

105. The actions listed in paragraph 55 violated the statute that created the basic mandates of the National Parks in that:

- The agency defendants violated the Park Service's own conclusions on what conservation was necessary to protect Caneel Bay in violation of the congressional mandate that the purpose of national parks is to "conserve the scenery and the natural and historic objects and the wild life therein and to provide for the enjoyment of the same in such a manner and by such means as will leave them ***unimpaired*** for the enjoyment of future generations."

54 U.S.C. § 100101(a)(emphasis added).

- The agency defendants preferred expanding private control over Caneel Bay by offering the whole of Caneel to private development and by removing guarantees of public access and local business mandates as a condition of any lease agreement in violation of the congressional mandate that National Parks be "preserved and managed ***for the benefit***

***and inspiration of all the people of the United States***…"

54 U.S.C. § 100101(b)(emphasis added).

- The agency defendants chose to prioritize expanding commercial exploitation of Caneel Bay over more conservative alternatives despite the congressional injunction that the Executive Branch power over the parks, "shall not be exercised in derogation of the values and purposes for which the System units have been established" and requiring that any authority to depart from those purposes be "directly and specifically provided by Congress."

54 U.S.C. § 100101(b)(2).

106. For these reasons the agency defendants made the actions in paragraph 55 unlawfully, in excess of statutory authority, and without observance of procedure required by law.

107. Under the Administrative Procedure Act, as a consequence of these violations of the National Parks Organic Statute, the Court must hold unlawful, vacate, and enjoin implementation of the final agency actions listed in paragraph 55.

**COUNT TEN: Writ of Prohibition.**

108. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

109. The Parks Coalition and the Eco-Collective bring this Count in the alternative to their claims under the Administrative Procedure Act. To the extent this Court determines that the Administrative Procedure Act does not provide an adequate or complete remedy to address Defendant's ongoing unlawful actions, the plaintiffs are entitled to relief under the All Writs Act. 28 U.S.C. §§ 1651.

110. The Agency defendants owe the plaintiffs and the public a clear, non-discretionary, and ministerial statutory duty under the National Park Service Concessions Management Improvement Act of 1998, 54 U.S.C. § 101911 *et seq.*, to use the concession contract framework—and strictly avoid the leasing framework—when making national park land or facilities available to private entities providing visitor accommodations.

111. The agency defendants further owe the plaintiffs and the public a clear, non-discretionary, and ministerial duty to integrate and enforce the limitations established as legally binding prerequisites in the agency's own Finding of No Significant Impact issued for this project.

112. The agency defendants have completely abdicated these non-discretionary duties by issuing the May 7, 2026 Request for Proposals which improperly uses a leasing framework and entirely omits the limitations required by the project's own National Environmental Policy Act governing documents.

113. The agency defendants have no administrative discretion to substitute a lease for a concession contract under these factual circumstances, nor do they possess the discretion to ignore or omit binding "conditions and mitigation" requirements imposed by an Environmental Assessment and Finding of No Significant Impact.

114. Plaintiffs have a clear and indisputable right to the performance of these mandatory duties. Plaintiffs and their members will suffer immediate, severe, and irreparable harm if the agency defendants are permitted to evaluate bids and award an unlawful contract based on a structurally non-compliant Request for Proposals.

115. Plaintiffs have no other adequate, plain, speedy, or efficient remedy at law to prevent the imminent, unlawful execution of a contract that defies both statutory commands and binding environmental prerequisites.

116. Therefore, the plaintiffs seek a writ of prohibition against the agency defendants from implementing the actions taken in paragraph 55.

**COUNT ELEVEN: Ultra Vires Act.**

117. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

118. To the extent that the agency defendants claim that the actions listed in paragraph 55 are actions taken by the defendant Donald J. Trump in his capacity as president of the United States or by the defendant Executive Office of the President, or defendant Susie Wiles as that office's head, the actions were ultra vires—beyond their legal power— given that Congress has given them no power to take the actions listed in paragraph 55 and given that they were taken in contravention of the statutory mandates controlling our National Parks. Consequently, the plaintiffs are entitled to a declaration that the actions in paragraph 55 were unlawful, vacatur of these actions, and an injunction against their implementation.

119. Because defendants Trump, Suzie Wiles, and the Executive Office of the President are not "agencies" for purposes of the administrative procedure act, the plaintiffs make this claim without alternative remedies available against these three defendants and thus the plaintiffs make this as an equitable claim for the relief described below.

## PRAYER FOR RELIEF

WHEREFORE, the plaintiffs respectfully request that the Court grant the following relief:

1. A declaration under the Administrative Procedure Act that the actions listed in paragraph 55 were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, in excess of statutory jurisdiction, authority, or limitations, or short of statutory right such that they are unlawful and are set aside.

2. An order under the Administrative Procedure Act vacating the National Park Service May 7, 2026 Request for Proposals and enjoining the agency defendants or anyone acting on their behalf from leasing land to provide accommodations on National Park land at Caneel Bay, St. John, U.S. Virgin Islands.

3. A temporary restraining order, a preliminary and permanent injunction or a stay (5 U.S.C.§ 705) without bond or with nominal bond under the Administrative Procedure Act barring implementation of the actions listed in paragraph 55.

4. A Writ of Prohibition compelling the agency defendants in their official capacities, to immediately cease and desist from evaluating bids, selecting a winner, or executing any final lease under Request for Proposals issued by the Park Service on May 7, 2026.

5. A declaration that any order authorizing or directing the actions in paragraph 55 from the defendants President Donald J. Trump, Susie Wiles, the Executive Office of the President or anyone acting on their behalf was ultra vires: that it lacked authority in law, and is null and void.

6. An injunction barring implementation of any orders declared by the court to be ultra vires.

7. An award to the plaintiffs of reasonable fees, expenses, and costs under 28 U.S.C. § 2412.

8. Such other relief as the Court may deem just.

Respectfully submitted,

Thomas G. Moukawsher
Law Office of Thomas G. Moukawsher
D.C. District Court Bar ID: CT0030
Connecticut Bar No. 305363
70 Tyler Avenue, Groton, CT 06340
(860) 235-0406
moukawsher@gmail.com
Counsel for plaintiffs

**CERTIFICATE OF SERVICE**

I certify that on October 26, 2026, I sent defendants a copy of this complaint by email sent to the defendants or their representatives at the following email addresses:

**Eric J. Hamilton,** Deputy Assistant Attorney General, Federal Programs Branch, DOJ
Eric.hamilton@usdoj.gov.

**Alex Haas,** Co-Director, Federal Programs Branch, DOJ
Alex.haas@usdoj.gov.

**John Griffiths,** Co-Director, Federal Programs Branch, DOJ
John.griffiths@usdoj.gov.

**U.S. Attorney's Office for the District of Columbia**: USADC.ServiceCivil@usdoj.gov.

**Douglas Burgum,** Secretary of the Interior: Douglas.burgum@ios.doi.gov.

**Jessica Bowron,** Acting Director, National Park Service: Jessica_bowron@nps.gov.

**Darell Echols,** Acting Regional Director of Region 2 of the National Park Service:
darell_echols@nps.gov.

**Penelope Del Bene**, Superintendent of the Virgin Islands National Park,
penelope_del_bene@nps.gov.

I further certify that on October 26, 2026, I sent a copy of this complaint by certified mail, return receipt requested as well as by overnight mail to all defendants, the United States Attorney General, and the United States Attorney for the District of Columbia as follows:

**U.S. Department of the Interior**
Office of the Solicitor
U.S. Department of the Interior
1849 C Street, NW, MS-6511
Washington, DC 20240

**Douglas Burgum**
Office of the Solicitor
U.S. Department of the Interior
1849 C Street, NW, MS-6511
Washington, DC 20240

**National Park Service**
Office of the Solicitor
U.S. Department of the Interior
1849 C Street, NW, MS-6511
Washington, DC 20240

**Jessica Bowron**
Office of the Solicitor
U.S. Department of the Interior
1849 C Street, NW, MS-6511
Washington, DC 20240

**President Donald J. Trump**
Executive Office of the President
Office of the White House Counsel
1600 Pennsylvania Avenue, NW
Washington, DC 20500

**Susie Wiles**
Executive Office of the President
Office of the White House Counsel
1600 Pennsylvania Avenue, NW
Washington, DC 20500

**Executive Office of the President**
Office of the White House Counsel
1600 Pennsylvania Avenue, NW
Washington, DC 20500

**Darell Echols**
National Park Service
100 Alabama Street SW, 1924 Building, 6th Floor
Atlanta, GA 30303;

**Penelope Del Bene**
Virgin Islands National Park
1300 Cruz Bay Creek St. John, VI 00830.

**Jeanine Ferris Pirro**
**U.S. Attorney for the District of Columbia**
Civil Process Clerk
U.S. Attorney's Office for the District of Columbia
601 D Street, NW
Washington, DC 20530

**Todd Blanche**
Attorney General of the United States
Attn: Assistant Attorney General for Administration
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001



By Thomas G. Moukawsher
Law Office of Thomas G. Moukawsher
D.C. District Court Bar ID: CT0030
Connecticut Bar No. 305363
70 Tyler Avenue, Groton, CT 06340
(860) 235-0406
moukawsher@gmail.com

Attorney for Plaintiffs